## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JEAN MARIE PETERSON, | ) | CASE NO. 1:16CV769 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Jean Marie Peterson ("Plaintiff" or "Peterson"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and 423 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be VACATED and the matter REMANDED

for further proceedings consistent with this Report & Recommendation.

## I.   PROCEDURAL HISTORY

In June 2012, Peterson filed applications for POD and DIB, alleging a disability onset

1

date of December 7, 2011 and claiming she was disabled due to spinal cord damage. (Transcript ("Tr.") 17, 180, 203.) The applications were denied initially and upon reconsideration, and Peterson requested a hearing before an administrative law judge ("ALJ"). (Tr. 129-137, 139-145, 146. )

On April 24, 2014, an ALJ held a hearing, during which Peterson, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 34-97.) On October 24, 2014, the ALJ issued a written decision finding Peterson was not disabled. (Tr. 17-26.) The ALJ's decision became final on January 29, 2016, when the Appeals Council declined further review. (Tr. 1-5.)

On March 29, 2016, Peterson filed her complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15, 16.) Peterson asserts the following assignments of error:

(1)     The ALJ violated the treating physician rule when discussing the opinion of treating neurologist K.C. Ravishankar, M.D.

(2)     The ALJ's conclusion that the residuals of Peterson's spinal injury did not meet or equal Listings 11.04B and 11.08 is not supported by substantial evidence.

(Doc. No. 13.)

## II.   EVIDENCE

### A.     Personal and Vocational Evidence

Peterson was born in November 1963 and was fifty (50) years-old at the time of her administrative hearing, making her a "person closely approaching advanced age" under social security regulations. (Tr. 180.) *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d). She has a high school education and two years of college, and is able to communicate in English. (Tr. 202, 204)

2

She has past relevant work as a medical assistant.  (Tr. 25.)

**B.      Relevant Medical Evidence**

Peterson was severely injured in motorcycle accident on July 4, 1986.  (Tr. 536.)  She was riding on the back of a motorcycle with her husband when they were struck from behind by a drunk driver.  (*Id.*)  A CT scan of her thoracic spine showed wedge compression fracture of T5 and T6 with mild anterior displacement of T5, as well as a comminuted fracture of the body and posterior element of T5 and T6.  (*Id.*)  Treatment notes also indicated incontinence "in bowel and bladder."  (*Id.*)  On July 6, 1986, Peterson underwent a decompressive laminectomy of the T5 and T6 vertebrae with Harrington rod fixation through T2 and T10.  (*Id.*)  On July 22, 1986, when she failed to show significant improvement after surgery, Peterson was transferred to a rehabilitation facility for further treatment.  (*Id.*)

Peterson remained in the rehab facility from July 22, 1986 through October 3, 1986.  (Tr. 536.)  Her treatment consisted of physical therapy for muscle strengthening, endurance training, and gait training, as well as occupational therapy.  (Tr. 537.)  By September 29, 1986, Peterson was able to ambulate with one straight cane independently for distances of approximately 400 feet.  (*Id.*)  She was noted to use a two point gait when using her straight cane for ambulation, but continued to have increased extensor spasticity of the left lower extremity during the swing-through phase of her gait.  (*Id.*)  Adaptive equipment was ordered, as well as a wheelchair.[1]  (*Id.*)

In 2006, Peterson presented to urologists[2] on several occasions with complaints of

---

[1] Peterson's counsel explained during the hearing that, as a result of this accident, Peterson received social security disability benefits from 1987 until 2004.  (Tr. 41.)

[2] The signatures on these treatment notes are illegible.

3

urinary urgency and a history of right flank pain.  (Tr. 273-278.)  She was prescribed Levaquin and treated for recurrent urinary tract infections.  (*Id.*)  Treatment notes from 2008 reflect similar complaints, with Peterson reporting she had suffered from "chronic urge incontinence and frequency secondary to spinal cord injury."  (Tr. 282-285.)

In August 2010, Peterson presented to Terrance Foley, M.D., with complaints of recent right posterior and eighth rib pain.  (Tr. 356-358.)  She reported a history of osteoporosis since 2006, and stated she "still falls" once per month due to spinal injuries suffered in the 1986 accident.  (Tr. 357.)  On examination, Dr. Foley noted a spastic, ataxic gait, decreased range of motion of her cervical and lumbar spines, hip flexor muscle strength of 3/5 left and 4/5 right, knee flexor strength of 4/5 bilaterally, and quad strength of 4+/5 bilaterally.  (Tr. 356.)  He ordered x-rays of Peterson's chest and ribs, which showed "probable remote fractures of the right fourth, fifth, and sixth ribs."  (Tr. 297.)

Peterson returned to Dr. Foley on September 13, 2010.  (Tr. 354-355.)  Dr. Foley noted the x-rays failed to confirm any new rib fractures.  (*Id.*)  Examination again revealed a spastic/ataxic gait and reduced range of motion in Peterson's cervical and lumbar spines.  (*Id.*)  Dr. Foley assessed osteoarthritis and "mild osteopenia."  (*Id.*)

In August 2011, Peterson complained of sensory loss since the 1986 accident.  (Tr. 353.)  She reported pain in her right elbow, fatigue, and achiness/stiffness in the morning.  (*Id.*)  Dr. Foley noted spastic gait and assessed osteoporosis and possible inflammatory arthritis.  (Tr. 352.)  In November 2011, laboratory studies showed positive ANA results.  (Tr. 306.)  Dr. Foley again noted spastic gait secondary to spinal cord injury.  (Tr. 350.)  He assessed osteoarthritis and mixed connective tissue disease.  (*Id.*)  A bone density study performed the following month

4

revealed osteopenia and met the National Osteoporosis Foundation criteria for pharmacologic treatment of low bone density.  (Tr. 323.)

On July 12, 2012, Peterson was injured in a motor vehicle accident while she was on vacation at Put-In-Bay.  (Tr. 444.)  Treatment records indicate she was riding on a golf cart when it was hit from the back by an SUV.  (*Id*.)  Peterson was thrown from the cart and landed on her right side.  (Tr. 363.)  She was admitted to the hospital for multiple injuries, including pain in her right wrist.  (*Id*.)  Examination revealed sensory impairment on the right side of Peterson's body from the T5 level down to her toes and motor deficit on the left side of her body from T5 down to her toes, from her previous 1986 accident.  (Tr. 363-364, 444.)  Peterson underwent a series of tests in the hospital, including x-rays of her wrist, pelvis, femur, and lumbar spine; CT scans of her brain, chest, cervical spine, abdomen, and pelvis; and an MRI of her cervical spine.  (Tr. 389-409, 474-478.)

The CT of Peterson's chest revealed "significant bony spurring at C6-C7 with wedging and exaggerated kyphosis seen at T5-T6 level likely representing remote injury."  (Tr. 478.)  The MRI showed old compression injuries at T5 and T6 with associated focal kyphosis and a focal abnormal signal in the cord consistent with remote myelomalacia.  (Tr. 397-398.)  Finally, an x-ray of Peterson's right wrist showed a "communited impacted and extensively intraarticular fracture with dorsal angular impaction."  (Tr. 399-400, 475.)

Orthopedic physicians in the emergency room performed a close reduction and fixation of Peterson's right wrist fracture, and then placed her arm in a splint.  (Tr. 361.)  Short-term acute rehabilitation was recommended "due to [the] nonweightbearing status of her right hand and her pre-existing neurological deficits in her lower extremities."  (*Id.*)  In particular, "they

5

found it would be difficult for her to protect herself from falling while at home and she was considered a fall risk."  (*Id.*)

Peterson was transferred to an acute rehab facility on July 16, 2012, and was examined the following day by Pragati Singh, M.D.  (Tr. 361, 445.)  On examination, Dr. Singh noted Peterson had an "unsteady gait due to prior injury" and "sensory impairment on the right side of the body and motor deficit on the left side of the body down T5."  (Tr. 444.)  He did not "appreciate any motor impairment," but noted Peterson's "gait is certainly unsteady. . . [s]he drags her left lower extremity when walking."  (Tr. 445.)  Treatment notes indicate Peterson's wrist continued to heal and, although her gait was unsteady, she was able to ambulate on her own or with little assistance and was "mostly independent with all [activities of daily living.]" (Tr. 449.)  She complained of pain and discomfort in her right forearm and mid/low back, but declined prescription pain medication because "she does not like narcotic medications."  (Tr. 446, 451.)  Peterson was discharged on July 27, 2012, despite recommendations that she stay longer to continue her therapy services.[3]  (Tr. 447.)

On August 3, 2012, Peterson presented to Oscar Velez, M.D., with complaints of continued chest wall pain.  (Tr. 459-460.)  On examination, Peterson was in "no significant distress" and her orthopedic examination was "grossly normal, with normal ambulation."  (Tr.

---

[3] While in the rehab facility, Peterson was seen by orthopedist Harry Hoyen, M.D.  (Tr. 514-519.)  On July 19, 2012, Dr. Hoyen noted moderate swelling in Peterson's wrist, as well as a limited gait.  (Tr. 517-518.)  He applied a cast to Peterson's right wrist and ordered x-rays.  (*Id.*)  Peterson returned to Dr. Hoyen on July 26, 2012, at which time he found that "alignment is appropriate" and continued with cast immobilization.  (Tr. 514-515.)  In August 2012, Dr. Hoyen interpreted additional x-rays of Peterson's right wrist and found "good healing."  (Tr. 511-512.)  He noted the "radius fracture is healing" and transitioned Peterson to a splint.  (Tr. 512.)

459.)  Dr. Velez assessed chest wall contusion and right arm fracture.  (*Id.*)  He advised Peterson to do range of motion exercises and found she might need further physical therapy "if the problem does not improve quickly."  (*Id*.)

On October 30, 2012, Peterson began treatment with John Schnell, M.D., for low back pain.  (Tr. 486-488.)  She reported "difficulty walking at baseline, worse after this recent [motor vehicle accident]," chronic thoracic spine pain, patchy numbness in her lower abdomen and both legs, and "some urgency issues with bowel/bladder."  (Tr. 486-487.)  Dr. Schnell noted Peterson walked with a cane.  (Tr. 487.)  Examination revealed mild bilateral paraspinal tenderness and pain with range of motion in the thoracic region, 4/5 strength in her lower extremities, positive bilateral Babinski signs, 2-3+ reflexes in the bilateral quadriceps ankle jerk, and patchy numbness in her abdomen and both legs.  (Tr. 487.)  Dr. Schnell assessed thoracic sprain and strain, finding Peterson "obviously has signs of thoracic paraparesis with patchy loss of sensation and some motor strength scores below the T5-6 injury."  (*Id*.)  He also noted "lower extremity hyper-reflexia, which I would think are consistent solely with her prior injury."  (*Id*.)  He started Peterson on prednisone and ordered CT scans of her thoracic spine.  (*Id*.)

Peterson underwent a CT of her thoracic spine on November 13, 2012, which was interpreted as follows:

1.   Old healed compression fractures of T5 and T6 are seen with degenerative disc disease at the T6-T7 level and with degenerative changes involving the inferior end plate of T6 and superior end plate of T7.

2.   As a result of these compression fractures of T5 and T6, there is retropulsion of the dorsal aspect of T5 and of the dorsal aspect of the superior endplate of T6 into the spinal canal by a distance of approximately 4 mm with resultant spinal stenosis.  I would presume that there is also a mild degree of thoracic cord compression at this

7

level.

3.    There is rather severe left foraminal stenosis at T5-T6, with mild right foraminal stenosis at T5-T6.

(Tr. 479.)  Along similar lines, a thoracic x-ray taken the same day, revealed as follows:

> Lateral views of the thoracic spine in the neutral, flexed, and extended positions are performed.  There is marked accentuation of dorsal kyphosis with compression fractures of the fifth and sixth thoracic vertebral bodies appreciated.  Anterior wedging of these vertebral bodies is seen and the degree of anterior wedging appears more severe at the level of T6 as compared to the level of T5.  I suspect that there has also been retropulsion of the dorsal aspect of the fifth thoracic vertebral body and of the dorsal aspect of the superior end plate of T6 into the spinal canal.  There is reactive sclerosis and spurring anteriorly of the inferior end plate of T6 and the superior end plate of T7.  The examination shows quite limited range of motion with flexion and extension.  No subluxation is seen.

(Tr. 465.)

Peterson returned to Dr. Schnell on December 6, 2012, complaining of increased pain across the upper and mid thoracic spine.  (Tr. 471-472.)  Cervical examination revealed mild tenderness in the bilateral paraspinal and normal range of motion with bilateral neck pain with cervical extension/sidebending but no pain radiation into the bilateral upper extremities.  (*Id.*)  In addition, Dr. Schnell again found mild bilateral paraspinal tenderness and pain with range of motion in the thoracic region, 4/5 strength in her lower extremities, positive bilateral Babinski signs, 2-3+ reflexes in the bilateral quadriceps ankle jerk, hyperreflexia, and patchy numbness in her abdomen and both legs.  (*Id.*)  He also noted that "some gait/subtle disturbances, less security during ambulation followed the accident, but are steadily improving with time."  (*Id.*)  Finally, Dr. Schnell remarked that Peterson did not want to pursue therapy or massotherapy for her neck and mid back pains.  (*Id.*)

Meanwhile, on November 7, 2012, Peterson began treatment with neurologist K.C.

8

Ravishankar, M.D.  (Tr. 498-499.)  She complained of (1) increased lower back pain and difficulty walking since the July 2012 golf cart accident; and (2) chronic bladder and bowel symptoms since the 1986 accident.  (*Id*.)  On examination, Dr. Ravishankar found Peterson had 5/5 strength in her bilateral lower extremities, spasticity in both lower limbs, decreased vibration sensation in the lower extremities, "sensory level at around T4-T5 levels to light touch and pain," hyperreflexia, and spastic gait.  (*Id*.)  He also noted she used a cane.  (*Id*.)  Dr. Ravishankar ordered MRIs of Peterson's cervical and thoracic spines "to rule out new neurological developments in the cervical and/or thoracic spinal cord after her recent accident in July 2012."  (Tr. 499.)

Peterson underwent an MRI of her cervical spine on December 12, 2012.  (Tr. 523-524.) The results were "very limited" due to Peterson's inability to proceed with the study due to claustrophobia.  (*Id*.)  With that qualification, the MRI revealed the following: (1) kyphosis centered on T5-T6 with a mild to moderate chronic compression of T5 and T6; (2) marked disc space narrowing at T5-T6 with mild disc space narrowing at T3-T4, T4-T5, and T6-T7 with degenerative changes; (3) status post laminectomy at T6 and T7 and probably T5; (4) mild canal narrowing at T5-T6 without cord compression; (5) abnormal appearance of the upper thoracic cord abrupt transition at T6-T7, with the cord appearing atropic at T1-2; and (6) probable mild disc herniation at T6-T7 measuring about 3 mm with slight ventral impingement of the cord.[4] (*Id*.)

---

[4] Peterson also underwent a bone density scan on December 10, 2012.  (Tr. 490.) This scan revealed as follows: "Osteoporotic lumbar spine and osteopenia of the left hip bone mineral density with decrease in bone mineral density since the previous exam, for which follow up study in one year is recommended with appropriate treatment."  (*Id*.)  The scan also noted Peterson was at high risk for fracture due to her osteoporosis.  (*Id*.)

Peterson returned to Dr. Velez on January 22, 2013.  (Tr. 492-493.)  She reported continued ataxia, stating it was "very difficult for her to ambulate normally."  (*Id.*)  On examination, Dr. Velez noted no significant weakness, paralysis or significant muscle atrophy.  (*Id.*)  He assessed osteoporosis, moderately severe; and generalized osteoarthritis, multiple cites.  (*Id.*)

MRIs of Peterson's thoracic spine were performed on February 1, 2013 and February 12, 2013.  (Tr. 503-504, 526-527.)  The MRI dated February 1, 2013 showed the following: (1) a 2mm disc protusion without cord compression at C6-C7; (2) moderate kyphosis at T5-T6; (3) moderate chronic decreased height of the T5 vertebral body and mild to moderate chronic decreased height of the T6 vertebral body; (4) disc space narrowing at T5-T6 and T6-T7 with degenerative changes; (5) status post laminectomy from T5 to T7; (6) disc space narrowing at T5-T6 and T6-T7 with degenerative changes; (7) degeneration at T5-T6, T6-T7, and T7-T8; (8) a 2 mm retropulsion of T5 relative to T6 in the central and left paramedian position, along with a 2 mm disc bulge, mild canal narrowing, and apparent atrophic cord; (9) a 1-2 mm central disc protrusion at T6-T7 with mild canal narrowing without cord compression; and (10) abnormal appearance to the cord beginning above and extending below the T6-T7 level, with need for additional imaging.  (Tr. 503-504.)

The thoracic MRI dated February 12, 2013 also had multiple findings, including the following: (1) thoracic kyphosis and chronic decreased height of the T5 and T6 vertebral bodies; (2) status post probable laminectomy from T4 to T6; (3) expanded cord at lower margin of T12 with suggestion of ventral soft tissue density behind T5 which caused mild canal narrowing and mild cord impingement; (4) small probable central syrinx in the cord at the mid portion of T5;

and (5) moderate thinning and atrophy at T5-T6 to T6-T7.  (Tr. 526-527.)

On April 15, 2013, Peterson presented to Dr. Ravishankar for follow-up regarding her persistent low back pain and difficulty walking.  (Tr. 500-501.)  She reported feeling "OK now," stating her "back pain has been much better, but she continues to have pain on and off."  (*Id*.)  On examination, Dr. Ravishankar noted chronic spasticity in Peterson's lower limbs, no focal weakness, 5/5 muscle strength in both the upper and lower limbs, no abnormal limb movements, and hyperreflexia in the bilateral lower limbs.  (*Id*.)  He also noted Peterson had a spastic gait and used a cane.  (*Id*.)  Dr. Ravishankar assessed low back pain and spastic gait with bladder and bowel symptoms due to an old spinal cord injury.  (*Id*.)  He noted "neurologically she has no new deficits after an accident in July 2012."  (*Id*.)

Peterson returned to Dr. Ravishankar on November 5, 2013.  (Tr. 532-533.)  She reported "feel[ing] okay without any new problems at this time."  (*Id*.)  Dr. Ravishankar noted the MRI of Peterson's thoracic spine in February 2013 showed "no acute changes," but then stated "there were chronic atrophic changes in the thoracic spinal cord."  (*Id.*)  Examination revealed chronic spasticity in both lower extremities, spastic gait, and hyperreflexia in both lower limbs.  (*Id*.)  He assessed chronic back pain with chronic spasticity in both lower limbs, and concluded "no further intervention is necessary at this time."  (*Id*.)  Peterson was advised to follow up in a year for reevaluation.  (*Id*.)

On May 5, 2014, Dr. Ravishankar submitted a Medical Source Statement regarding Peterson's Spinal Disorders.  (Tr. 543-544.)  He indicated diagnoses of "spasticity in both limbs related to an accident in 1986 and reinjury in 2012."  (*Id*.)  In a check box form, Dr. Ravishankar indicated there was no evidence of the following: (1) compromise of the nerve root or the spinal

11

cord; (2) neuro-anatomic distribution of pain; or (3) motor loss (atrophy with associated muscle

weakness, or muscle weakness).  (*Id*.)  He indicated, however, that Peterson did exhibit a limited

range of movement of the spine, sensory loss at around T4-T5, and loss of reflexes.  (*Id*.)  Dr.

Ravishankar opined that, during an eight hour workday, Peterson could be expected to sit for 60

to 90 minutes; and stand/walk for less than 30 minutes.  (*Id*.) He further concluded Peterson

could lift and carry 0 to 5 lbs for about 2 hours, and could spend "very little" time carrying any

greater weight.  (*Id*.)  Lastly, he noted Peterson needed a cane to ambulate and would be off task

for at least 15% of the workday.  (*Id*.)

On the same date, Dr. Ravishankar completed another form regarding Peterson's physical

condition, which consisted of three questions.  (Tr. 547.)  The first question asked whether there

is any evidence of spinal cord lesion.  Dr. Ravishankar checked the yes box, and wrote "please

see attached MRI- report [dated February 12, 2013]."  (*Id*.)  The second question, and Dr.

Ravishankar's response, is as follows:

> 2.        Does the patient exhibit significant and persistent disorganization of motor
>
>           function in two extremities? __ Yes __ No.
>
>           If yes, is it in two legs?  X_  Yes __ No.  "Spasticity."

(*Id*.)  Finally, the third question asked as follows:  "On the MRI of the thoracic spine, does a

syrinx of the spinal cord qualify as a lesion or an abnormality of the spinal cord?"  (*Id.*) Dr.

Ravishankar checked the "yes" box, and wrote:  "syrinx is probably a result of the injury."  (*Id*.)

He did not answer the further follow-up question:  "If yes, did it result in sustained disturbance

of gait and station?"  (*Id*.)

Dr. Shnell also completed a questionnaire regarding Peterson's physical impairments.

12

(Tr. 469-470.)  He indicated Peterson had limited motion in her joints and/or spine, and described her gait as "slow, weak legs."  (*Id*.)  Dr. Schnell also noted that Peterson used an ambulatory aid and opined that such aid was medically necessary.  (*Id*.)  Finally, he stated that these findings had persisted despite therapy since 1986.  (*Id*.)

## C.    State Agency Reports

On November 19, 2012, state agency physician William Bolz, M.D., reviewed Peterson's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 105-107.)  Dr. Bolz determined Peterson could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about 6 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday.  (Tr. 106.)  He further found Peterson could frequently stoop; occasionally kneel, crouch, crawl, and climb ramps and stairs; and never climb ladders, ropes or scaffolds.  (*Id*.)  Dr. Bolz found she had an unlimited capacity to push, pull and balance, and no manipulative or environmental limitations.  (*Id*.)

On April 3, 2013, state agency physician Diane Manos, M.D., reviewed Peterson's medical records and completed a Physical RFC Assessment.  (Tr. 119-121.)  Her opinion differed from Dr. Bolz's in several respects.  She concluded Peterson could lift and carry 20 pounds occasionally and 10 pounds frequently, and sit for a total of about 6 hours in an 8 hour workday; but could only stand and/or walk for a total of 2 hours.  (Tr. 119.)  Dr. Manos found Peterson had limited push/pull capacity in her bilateral upper extremities.  (*Id*.) She also determined Peterson was limited to occasional bilateral lower extremity foot controls, and that she could walk/stand for 15 minute intervals for a total of 2 hours in an 8 hour workday.  (*Id*.) Dr. Manos opined Peterson could frequently stoop; occasionally balance, kneel, crouch, crawl,

and climb ramps and stairs; and never climb ladders, ropes, and scaffolds.  (Tr. 120.)  Finally,

Dr. Manos found Peterson should avoid all exposure to heights, hazards or commercial driving.

(Tr. 121.)

**D.    Hearing Testimony**

During the April 24, 2014 hearing, Peterson testified to the following:

- She finished high school and completed a "few years" of college.  (Tr. 47.)  She is married and lives in a single story home with her husband.  (Tr. 46.)

- In July 1986, she was severely injured in a motorcycle accident.  (Tr. 48.)  She and her husband were riding the motorcycle when they were struck by a drunk driver.  (Tr. 48.)  After the accident, she could not walk for a month and a half.  (Tr. 54.)  She was at Metro for three months, where she had to "learn to walk again."  (*Id.*)

- She did not work from the time of the accident, July 1986, to 1997.  (Tr. 47.)  In 1997, she thought she was getting stronger and decided to try working.  (Tr. 48-49.)  From 1998 to 2001, she worked part-time as a retail cashier.  (Tr. 50.)  Beginning in 2003, she worked full-time as a medical assistant.  (Tr. 50.)  She was fired from that job in 2009.  (Tr. 55.)  She then worked part-time as a cashier at K-Mart.  (Tr. 56.)  She stopped working altogether in December 2011 because she "just couldn't do it anymore."  (*Id.*)

- In July 2012, she was injured while riding in a golf cart at Put-In-Bay.  (Tr. 51.)  A drunk driver hit the cart she was riding in.  (Tr. 51.)  She was thrown from the cart and fractured her right wrist.  (*Id.*)  This accident also exacerbated her back condition.  (Tr. 52.)

- She experiences pain in her upper back and mid-thoracic region.  (Tr. 53.)  On a typical day, her pain is a seven on a scale of ten.  (*Id.*)  She also has numbness and weakness in her legs, the right worse than the left.  (Tr. 54.)  She still cannot feel her right leg "all the way up to [her] place of injury."  (*Id.*)  As a result of her leg numbness/weakness, she "can't seem to walk," has an ataxic gait and problems balancing, and falls frequently.  (Tr.  54, 60, 64.)  Her physician advised her to use a cane for balance and stability.  (Tr. 54-55.)  She testified she has used an assistive device continuously since December 2011.  (Tr. 64.)  Later,  she stated she did not start using a cane until after the second accident occurred in July 2012.  (Tr. 81.)

- She also experiences pain in her right wrist as a result of the July 2012 golf cart

14

accident.  (Tr. 51-52.)  Her doctor has diagnosed her with osteoarthritis.  (Tr. 52.)  She cannot hold things well; however, she can pick up a cup of coffee and button her coat.  (*Id.*)

- She has suffered from incontinence since the July 1986 motorcycle accident.  (Tr. 60.)  She has no muscle control over either her urine or her bowels.  (*Id.*)  She wears a pad everyday but not a diaper.  (Tr. 62.)  She has accidents approximately five times per week.  (*Id.*)  The process of cleaning herself up after each accident takes about 45 minutes.  (*Id.*)  She uses the bathroom approximately 6 to 10 times per day.  (Tr. 69.)  Sometimes, she has to go to the restroom as much as three times per hour.  (*Id.*)  When she was working as a medical assistant, she used the restroom at least four times per day.  (Tr. 96.)

- She will not take pain medication for her back condition because it "make[s] her sick."  (Tr. 53.)  Instead, she takes over-the-counter pain relief (Aleve) two to three times per week.  (*Id.*)  Mostly, she just "tolerates the pain."  (*Id.*)  With regard to her incontinence, her doctor advised her to take a pill for this condition.  (Tr. 61-62.)  However, she is "an anti-pill person," and decided to just "deal with it on her own."  (*Id.*)

- On a typical day, she gets up at 9 or 10 a.m., has coffee, and watches TV or reads.  (Tr. 58.)  She spends the afternoon doing chores, and makes dinner in the late afternoon.  (Tr. 58-59.)  She does not nap during the day.  (Tr. 59.)  She can take care of most of the household chores except her husband carries things for her (such as the laundry basket) and takes care of the floors, the garbage, and the yard.  (Tr. 57, 65-66.)  She also does the shopping.  (Tr. 67.)  She does not use an electric cart, but does use a cane while at the grocery store.  (*Id.*)  She has a handicap placard and, when she goes out, she parks in a handicap spot.  (Tr. 57-58.)

- She can lift a maximum of five to ten pounds.  (Tr. 57.)  Any more than that "pulls on her back."  (*Id.*)  She can walk for approximately 50 feet and then needs to sit down and take a break due to pain and fatigue.  (Tr. 57-58.)  Neither sitting or standing are comfortable positions for her.  (*Id.*)  She has to reposition herself every fifteen minutes.  (*Id.*)  She does not think she can do sedentary work because "I just cannot sit that long term.  I have to move."  (Tr. 59.)  She also cannot work because "I don't have the balance or the stamina and I don't have the strength."  (Tr. 60.)

The VE testified Peterson had past work as a medical assistant.  (Tr. 77.)  The VE noted the Dictionary of Occupational Titles ("DOT") classified this position as light, but Peterson had performed it at the sedentary level.  (*Id.*)  The ALJ then posed the following hypothetical

15

question:

> For my first hypothetical I'd like you to imagine a hypothetical individual with the claimant's vocational background, who is limited to lifting/carrying no more than 20 pounds occasionally and 10 pounds frequently; standing and walking for a total of two hours in an eight-hour workday; the individual has the ability to stand and walk at 15-minute intervals; sitting for approximately six hours in an eight-hour workday; the individual is limited to occasional bilateral lower extremity foot controls; should never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl; the individual should further avoid all exposure to hazards such as dangerous machinery and unprotected heights.  Given those limitations, would the hypothetical individual be able to perform Ms. Peterson's past work as a medical assistant?

(Tr. 77-78.)

The VE testified the hypothetical individual would be able to perform Peterson's past work as a medical assistant as she performed it (i.e., at the sedentary level), but not as classified in the DOT (i.e., at the light level).  (Tr. 78.)

The ALJ then posed a second hypothetical that was the same as the first, but changed it to a "true sedentary in that lifting and carrying up to 10 pounds at a time, and occasionally lifting less than 10 pounds; standing and walking for a total of two hours in an eight hour workday; and sitting for a total of six hours in an eight hour workday; and we can keep the standing and walking at 15-minute intervals in place with that hypothetical."  (Tr. 78.)  The VE testified the hypothetical individual would be able to perform Peterson's past work as a medical assistant as she performed it at the sedentary level.  (*Id*.)  He also testified there would be transferable skills including "health caring, customer service, and record keeping, and some general clerical ability."  (*Id*.)

Peterson's counsel then asked the VE whether "the need to use a cane for balance for an individual who is frequently falling" would impact the identified jobs.  (Tr. 85.)  After some

16

discussion between counsel and the VE, the ALJ clarified counsel's question as follows:

> ALJ: Dr. Mosley, so how does the cane impact? Whether it's hypothetical two at true sedentary, or hypothetical one under the, you know, I mean hypothetical one, I guess if you got to lift 20 pounds and you have a cane in your hand it's going to impact whether or not the claimant can perform her past work as she performed it, at sedentary, for at least the couple hours that she's got to stand to do that part of the job. But under hypothetical number two, would it impact a true sedentary hypothetical?

> VE: I don't think it [would] impact a true sedentary hypothetical.  I do think the cane would impact, as the [DOT] described, the medical assistant's position.

(Tr. 87-88.)

Counsel then asked the VE to consider a hypothetical individual that has accidents of bowel or urine five times a week (or at least one accident a workday) at random times, which would take her off-task for at least 45 minutes.  (Tr. 88-89.)  The VE testified such an individual would not able to perform Peterson's past work as a medical assistant, either as generally or actually performed.  (Tr. 90.)  The VE further testified such a limitation would preclude all jobs. (*Id*.)

Finally, counsel asked the impact on available jobs "if because of incontinence of bowel and bladder the individual, despite wearing pads, etcetera, has urgency and frequency so that the individual has to leave her job station to go attend to the bathroom, as often as six to 10 times a day."  (Tr. 90.)  The VE testified the individual "would have a difficult time maintaining employment."  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason

17

of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience.  *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing

18

his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Peterson was insured on her alleged disability onset date, December 7, 2011, and remained insured through December 31, 2016, her DLI.  (Tr. 17.)  Therefore, in order to be entitled to POD and DIB, Peterson must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.   The claimant has not engaged in substantial gainful activity since December 7, 2011, the alleged onset date (20 CFR 404.1571 et seq.)

3.   The claimant has the following severe impairments: residuals, status post spinal cord injury with thoracic degenerative disc disease, lower extremity neurological deficit, and neurogenic bladder (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work that involves lifting/carrying no more than 20 pounds occasionally and 10 pounds frequently; standing/walking for a total of two hours in an eight-hour workday; standing and walking at 15 minute intervals; sitting for approximately six hours in an eight-hour workday; occasional use of bilateral lower extremity foot controls; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and avoid all exposure to hazards, such as dangerous machinery and

19

unprotected heights.

6.     The claimant is capable of performing past relevant work as a medical assistant. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from December 7, 2011 through the date of the decision (20 CFR 404.1520(f)).

(Tr. 17-26.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Treating Physician Dr. Ravishankar

In her first assignment of error, Peterson argues the ALJ failed to articulate "good reasons" for rejecting the May 2014 opinions of treating physician, Dr. K.C. Ravishankar.  (Doc. No. 13 at 18.)  She maintains the ALJ improperly discounted Dr. Ravishankar's opinions on the grounds they conflicted with Peterson's activities of daily living, arguing the ALJ's characterization of Peterson's abilities to perform household chores is inaccurate.  Peterson also asserts the ALJ's second reason for discounting Dr. Ravishankar's opinions (i.e. that they were internally inconsistent and conflicted with his treatment notes) is "based on an inaccurate comparison of medical terms." (*Id*. at 20.)  Specifically, she maintains that:

> [T]he ALJ appears to believe chronic spasticity should always result in abnormal limb movements; however, spasticity also refers to the condition of the limb muscle being in a constant state of tension and rigidity.  The ALJ's misinterpretation of Peterson's medical condition caused him to cite and underline the lack of 'abnormal limb movements' as an inconsistency, rather than understanding the consistency reflected in the record with regard to her condition of chronic spasticity in the lower limbs.  The ALJ cited to Dr. Ravishankar's opinion citing no 'motor loss' as another inconsistency, but motor loss is not a symptom of spasticity.  There is in fact no inconsistency between Dr. Ravishankar's opinions and the treatment records.

(*Id.*)

The Commissioner argues "substantial evidence supports the ALJ's weighing of Dr. Ravishankar's opinion."  (Doc. No. 15 at 12.)  She asserts the ALJ properly discounted Dr. Ravishankar's "extreme opinions" in light of Peterson's ability to perform household chores and

22

drive.  The Commissioner also maintains Dr. Ravishankar's opinions were internally

inconsistent, arguing "the ALJ noted that in one opinion, Dr. Ravishankar indicated that there

was no evidence of compromise of the nerve root or spinal cord, no neuro-anatomic distribution

of pain, and no motor loss" but "[i]n the other opinion, Dr. Ravishankar stated that Plaintiff had

evidence of a spinal cord lesion and spasticity."  (*Id*. at 13.)  Finally, the Commissioner argues

other record evidence was inconsistent with Dr. Ravishankar's opinions, including the state

agency physicians' opinions, Peterson's conservative treatment history, and her non-compliance

with treatment recommendations.  (*Id*. at 14.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*,

2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  However, "a

finding that a treating source medical opinion . . . is inconsistent with the other substantial

evidence in the case record means only that the opinion is not entitled to 'controlling weight,'

not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399 (6th Cir.

2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at *

4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally

entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical

opinions are still entitled to deference and must be weighed using all of the factors provided in

20 C.F.R. § 404.1527 and 416.927."  *Blakley*, 581 F.3d at 408.[5]

---

[5] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a
treating physician's opinion, the Commissioner should consider the length of the
relationship and frequency of examination, the nature and extent of the treatment

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

---

relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs*., 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As noted above, in May 2014, Dr. Ravishankar submitted two medical source opinions regarding Peterson's physical impairments.  In the first, he opined that, during an 8 hour workday, Peterson could be expected to sit for 60 to 90 minutes, stand/walk for less than 30 minutes, and lift and carry no more than 5 lbs for about 2 hours.  (Tr. 543-544.)  He noted Peterson needed a cane to ambulate and would be off task for at least 15% of the workday.  (*Id*.)  As support for this opinion, Dr. Ravishankar stated Peterson suffered from "spasticity in both limbs related to an accident in 1986 and reinjury in 2012."  (*Id*.)  He found no evidence of compromise of the nerve root or the spinal cord, neuro-anatomic distribution of pain, or motor loss (atrophy with associated muscle weakness, or muscle weakness).  (*Id*.)  Dr. Ravishankar did, however, indicate Peterson exhibited a limited range of movement of the spine, sensory loss at

around T4-T5, and loss of reflexes.  (*Id*.)

      In the second form, Dr Ravishankar indicated there was evidence of spinal cord lesion,

citing the February 12, 2013 MRI of Peterson's thoracic spine.  (Tr. 547.)  He noted the syrinx

on Peterson's thoracic spine qualified as a lesion or an abnormality of the spinal cord, but did not

respond (either yes or no) to a question asking whether the syrinx resulted in sustained

disturbance of Peterson's gait and station.  (*Id*.)  Finally, he answered the following question as

follows:

> 2.      Does the patient exhibit significant and persistent disorganization of motor
>
>      function in two extremities? _____ Yes _____ No.
>
>      If yes, is it in two legs? _X__Yes _____ No.  "Spasticity."

(*Id*.)

      At step four of the sequential evaluation, the ALJ weighed Dr. Ravishankar's opinion as

follows:

> Treating physician K.C. Ravishankar, M.D., completed a Medical Source
> Statement Regarding Spinal Disorder(s) concerning the claimant on May 5, 2014
> (Exhibit 20F).  In response to this form, Dr. Ravishankar indicated the claimant
> experiences sensory loss in her thoracic spine, loss of reflexes, limited range of
> movement of the spine, but no neuro-anatomic distribution of pain or motor loss
> (Exhibit 20F).  In Dr. Ravishankar's opinion, the claimant could be expected to sit
> 60-90 minutes in an eight-hour workday, stand/walk less than 30 minutes in an
> eight-hour workday, and lift up to five pounds up to two hours of an eight-hour
> workday (Exhibit 20F).
>
> The undersigned gives limited weight to the opinion of Dr. Ravishankar, as his
> opinion is not fully supported in the evidentiary record, including the claimant's
> testimony that she is able to take care of most of the household chores, including
> cooking, doing laundry, and grocery shopping, and can lift up to 10 pounds.
> Further, there are inconsistencies in Dr. Ravishankar's objective findings between
> this opinion and another opinion that he offered on May 5, 2014 and earlier

treatment notes, as outlined in the decision above.[6]  Specifically, Dr.
Ravishankar's opinions are at odds in that, in his first opinion, he indicates that
there is no evidence of compromise of the nerve root (including the cauda spina)
or the spinal cord, and the claimant has no neuro-anatomic distribution of pain or
motor loss; however, in his second opinion, he indicates that claimant has
evidence of a spinal cord lesion, which results in spasticity of both legs.
However, on April 15, 2013, Dr. Ravishankar's treatment notes indicate the
claimant has chronic spasticity in the lower limbs, but no focal weakness,
decrease of strength, or abnormal limb movements.  (Exhibit 13F/7).  Ultimately,
the undersigned accommodates these standing/walking limitations in the residual
functional capacity finding above, which allows for standing/walking for only two
hours in an eight hour workday and standing and walking at 15 minute intervals.

(Tr. 24) (emphasis in original).

The ALJ then weighed the opinions of state agency physicians Dr. Bolz and Dr. Manos.

(Tr. 24-25.)  He accorded "limited weight" to Dr. Bolz's opinion, finding "the claimant to be

more restricted" in terms of her standing/walking abilities, use of foot controls, and exposure to

hazards.  (Id.)  The ALJ accorded "significant weight" to Dr. Manos' opinion, "as it is well

supported by the evidentiary record, with the exceptions of Dr. Ravishankar's opinions above,

and has incorporated her limitations into the [RFC]."  (Tr. 25.)

The ALJ formulated the following RFC:

After careful consideration of the entire record, the undersigned finds that
the claimant has the residual functional capacity to perform work that

---

[6] At step three, the ALJ discussed Dr. Ravishankar's opinion in the context of
determining that Peterson's impairments did not meet or medically equal Listing 11.08
(spinal cord or nerve root lesion).  (Tr. 20-21.)  Specifically, the ALJ found Dr.
Ravishankar's opinion did not provide support for the contention that Peterson satisfied
this Listing because "it is at odds with another opinion he issued on the same date,
indicating there is no evidence of compromise of the claimant's nerve root or the spinal
cord, and no motor loss or neuro-anatomic distirbution of pain."  (Tr. 20.)  The ALJ also
noted that Dr. Ravishankar failed to check the box indicating that Peterson exhibited
"significant and persistent disorganization of motor function in two extremities" and,
further, failed to indicate whether her condition resulted in "sustained disturbance of
gross and dexterous movements, or gait and station."  (Id.)

> involves lifting/carrying no more than 20 pounds occasionally and 10
> pounds frequently; standing/walking for a total of two hours in an eight hour
> workday; standing and walking at 15 minute intervals; sitting for
> approximately six hours in an eight hour workday; occasional use of
> bilateral lower extremity foot controls; never climb ladders, ropes, or
> scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch,
> and crawl; and avoid all exposure to hazards, such as dangerous machinery
> and unprotected heights.

(Tr. 21.)

As an initial matter, the Court notes it is uncontested that Dr. Ravishankar constitutes

Peterson's "treating physician" for purposes of social security regulations.  The record reflects

Peterson presented to Dr. Ravishankar on three occasions prior to his May 2014 opinion (in

November 2012, April 2013, and November 2013), and the ALJ specifically identifies Dr.

Ravishankar as Peterson's "treating physician" in the decision.  Thus, and in the absence of any

argument to the contrary, the Court finds the "good reasons" requirement applies to the ALJ's

discussion of Dr. Ravishankar's opinion.

The Court also finds that, while the ALJ stated that he "accommodate[d] [Dr.

Ravishankar's] standing/walking limitations in the RFC," the plain language of the RFC

demonstrates otherwise.  The RFC limits Peterson to standing and walking for a total of two

hours in an eight hour workday, at 15 minute intervals.  (Tr. 21.)  Dr. Ravishankar opined that,

during an eight hour workday, Peterson could stand/walk for "less than 30 minutes."  (Tr. 544.)

Plainly, the RFC does not accommodate or adopt Dr. Ravishankar's opinion regarding

Peterson's stand/walk capacity.  Nor did the ALJ adopt Dr. Ravishankar's opinions regarding

Peterson's abilities to sit and lift/carry.  While Dr. Ravishankar opined Peterson could sit for a

total of 60 to 90 minutes in an 8 work day and lift no more than 5 lbs for "about 2 hours," the

RFC limited Peterson to sitting for six hours in an 8 hour workday, and work that involves

28

lifting/carrying no more than 20 pounds occasionally and 10 pounds frequently.  (Tr. 21.)

Moreover, the RFC does not include Dr. Ravishankar's opinion that Peterson would be off-task

for at least 15% of the workday.  (Tr. 544.)

As Dr. Ravishankar constituted Peterson's treating physician, the ALJ was required

under social security regulations to provide "good reasons" for rejecting these opinions.  The

Court finds the ALJ failed to do so.  The primary reason provided by the ALJ is the alleged

"inconsistencies in Dr. Ravishankar's objective findings between this opinion and another

opinion that he offered on May 5, 2014 and earlier treatment notes."  (Tr. 24.)  In this regard, the

ALJ appears to indicate Dr. Ravishankar's findings of no evidence of nerve root/spinal cord

compromise and no neuro-anatomic distribution of pain or motor loss, are inconsistent with his

additional finding that Peterson had evidence of a spinal cord lesion resulting in spasticity in

both legs.  (*Id*.)  The ALJ also appears to believe these findings are inconsistent with Dr.

Ravishankar's April 2013 treatment note indicating chronic spasticity in the lower limbs but no

focal weakness, decrease of strength, or abnormal limb movements.  (*Id.*)

It is unclear to the undersigned why or how these various medical findings are

inconsistent.  Moreover, neither this Court or the ALJ have the special expertise necessary to

make such a determination.  The ALJ's finding that Dr. Ravishankar's opinions are internally

inconsistent and inconsistent with his own treatment notes essentially constitutes the ALJ's

interpretation of the medical data of record.  ALJs, however, are not trained medical experts and

it is well-established that they may not substitute their own opinion for that of a medical

professional.  *See, e.g., Meece v. Barnhart*, 192 Fed. Appx. 456, 465 (6th Cir. 2006) ("[T]he ALJ

may not substitute his own medical judgment for that of the treating physician where the opinion

29

of the treating physician is supported by the medical evidence.") (citing *McCain v. Dir., Office of Workers' Comp. Programs*, 58 Fed. App'x 184, 193 (6th Cir.2003) (citation omitted); *Pietrunti v. Director, Office of Workers' Comp. Programs, United States DOL*, 119 F.3d 1035, 1044 (2nd Cir.1997); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir.1990) ( "But judges, including [ALJs] of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.")); *accord Winning v. Comm'r of Soc. Sec.*, 661 F.Supp.2d 807, 823–24 (N.D. Ohio 2009) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not have the expertise to make medical judgments.'"); *Stallworth v. Astrue*, 2009 WL 335317 at *9 (S.D. Ohio, Feb. 10, 2009) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.") (quoting *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)). *See also Mascaro v. Colvin*, 2016 WL 7383796 at * 11 (N.D. Ohio Dec. 1, 2016); *Brewer v. Astrue*, 2011 WL 2461341 at * 6 (N.D. Ohio June 17, 2011).

Here, the ALJ impermissibly substituted his own judgment for that of Dr. Ravishankar. Dr. Ravishankar concluded, as Peterson's treating physician, that Peterson suffered from a chronic physical impairment that resulted in severe functional limitations. It is not self-evident that Dr. Ravishankar's two opinions are inconsistent, or that they are inconsistent with his April 2013 treatment note, and neither the ALJ nor this Court has the medical expertise to make that determination. Accordingly, the Court finds the alleged inconsistency between Dr. Ravishankar's opinions and treatment notes does not constitute a "good reason" for rejecting Dr. Ravishankar's assessment of Peterson's functional capacity.

The ALJ also rejected Dr. Ravishankar's opinion on the grounds it "is not fully

supported by the evidentiary record, including the claimant's testimony that she is able to take

care of most of the household chores, including cooking, doing laundry, and grocery shopping,

and can lift up to 10 pounds." (Tr. 24.)  The Court finds this does not constitute a "good reason"

for rejecting Dr. Ravishankar's opinion.  As an initial matter, the ALJ fails to acknowledge

Peterson's testimony that she needs her husband's assistance to perform many of her household

chores.  Specifically, she stated her husband has to carry dishes to the table, carry laundry

baskets, take out the garbage, mow the lawn, and rake the leaves, due to her lack of balance and

stability.  (Tr. 57, 65-66.)  She also testified that, while she does the grocery shopping, she uses a

cane at the store and leans on the shopping cart like a walker.  (Tr. 67.)  Thus, the ALJ's

suggestion that Peterson can perform household chores independently is not entirely accurate.

Moreover, the mere fact that Peterson acknowledged some rather minimal level of

activities, performed with some difficulty, is not necessarily indicative of an ability to perform

substantial gainful activity for 8 hours a day.  *See e.g., Kalmbach v. Comm'r of Soc. Sec*., 409

Fed.Appx. 852, 864 (6th Cir. 2011) (finding the claimant's ability to prepare her own meals,

dress herself independently, drive short distances and go to the grocery store, pharmacy and

church constituted "minimal activities [that] are hardly consistent with eight hours' worth of

typical work activities"); *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967) ("[t]he fact that

[a claimant] can still perform simple functions, such as driving, grocery shopping, dish washing,

and floor sweeping does not necessarily indicate that this [claimant] possesses an ability to

engage in substantial gainful activity. Such activity is intermittent and not continuous, and is

done in spite of pain suffered by [claimant].");  *Hall v. Celebrezze*, 314 F.2d 686, 690 (6th Cir.

1963) ("It was not necessary that [the claimant] be bedridden or wholly helpless in order to

31

establish his claim for benefits.")  *See also Osterland v. Colvin*, 2016 WL 4576092 at * 10 (N.D. Ohio Aug. 11, 2016).  Under the circumstances, the Court finds Peterson's ability to perform some household chores, with assistance and difficulty, does not constitute a "good reason" for rejecting Dr. Ravishankar's opinions.

In her Brief, the Commissioner asserts other record evidence is inconsistent with Dr. Ravishankar's opinions, including the state agency physicians' opinions, Peterson's conservative treatment history, and her non-compliance with treatment recommendations.  The Commissioner, however, cannot cure a deficient opinion by offering explanations that were not offered by the ALJ for rejecting Dr. Ravishankar's opinion.  As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012).  Here, the various arguments now advanced by the Commissioner were not articulated by the ALJ as reasons for rejecting Dr. Ravishankar's opinion.  Accordingly, this Court rejects the Commissioner's *post hoc* rationalizations.[7]

---

[7]  In any event, even if the ALJ had offered these reasons for rejecting Dr. Ravishankar's opinions, the Court is not convinced they would constitute "good reasons" for purposes of social security regulations.  While the Commissioner notes Dr. Ravishankar's opinions are inconsistent with the state agency physicians' opinions, the Sixth Circuit has rejected the argument that it is sufficient to reject a treating physician's opinion solely on the basis that it conflicts with the medical opinions of nontreating and nonexamining doctors. *See Gayheart*, 710 F.3d at 377 ("Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating

In sum, the Court finds the ALJ failed to set forth good reasons for rejecting the limitations assessed by Dr. Ravishankar.  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to properly address the physical functional limitations assessed by Dr. Ravishankar.  The ALJ is encouraged to consider enlisting the assistance of a Medical Expert to help interpret Dr. Ravishankar's opinions, as well as the treatment records and objective findings regarding Peterson's spinal condition.

### Listing 11.08

In her second assignment of error, Peterson argues the ALJ erred in finding, at step three, that the residuals of her spinal injury did not meet or medically equal Listings 11.04B and 11.08.  (Doc. No. 13 at 22.)  She asserts "the evidence overwhelmingly supports a finding that her condition met these Listings' requirements," noting "the medical record is replete with findings that Peterson had a disturbed, spastic gait that required her to use an assistive device." (*Id.* at 23.)  Peterson also relies on Dr. Ravishankar's May 2014 opinion as further evidence that she meets or equals the requirements of these Listings.

The Commissioner argues the ALJ reasonably evaluated Peterson's impairments under the Listings.  (Doc. No. 15 at 9.)  She maintains the totality of the evidence supports the ALJ's conclusion that Peterson did not demonstrate significant and persistent disorganization of motor function in two extremities, as required by Listing 11.08.  In this regard, the Commissioner

---

source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight t treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.") Moreover, although the ALJ notes earlier in the decision that Peterson has refused prescription pain medication, the record contains notations that Peterson is allergic to such medication.  (Tr. 363, 444, 486.)  The ALJ did not discuss or address this issue in the decision.

asserts the ALJ properly found that Dr. Ravishankar's opinion did not support Peterson's argument that she met or equaled these Listings.  She further argues the ALJ also considered the objective findings "none of which supported the requisite listing requirements."  (Id. at 11.)

At the third step in the disability evaluation process, a claimant will be found disabled if his or her impairment meets or equals one of the Listing of Impairments.  20 C.F.R. §§ 404.1520(a)(4) (iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 2010 WL 2294531 at * 3 (6th Cir. June 7, 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  In other words, a claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled, and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  A claimant must satisfy all of the criteria to "meet" the listing.  *Id.; Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir.2009).  However, a claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).  Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at

*3–4 (6th Cir. April 1, 2011); *Smith–Johnson v. Comm'r of Soc. Sec.*, 2014 WL 4400999 at *

5–6 (6th Cir. Sept.8, 2014); *Hunter v. Comm'r of Soc. Sec.*, 2011 WL 6440762 at * 3–4 (N.D.

Ohio Dec.20, 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently

clear the reasons for his decision.  *See Reynolds*, 2011 WL 1228165 at * 4–5; *Marok v. Astrue*,

2010 WL 2294056 at *3 (N.D. Ohio Jun.3, 2010); *Waller v. Comm'r of Soc. Sec.*, 2012 WL

6771844 at * 3 (N.D. Ohio Dec.7, 2012); *Keyes v. Astrue*, 2012 WL 832576 at * 5–6 (N.D. Ohio

March 12, 2012).

At the hearing before the ALJ, Peterson expressly argued that her spinal condition met

or equaled Listing 11.08.  (Tr. 41-43.)  This Listing requires a claimant to exhibit disorganization

of motor function as described in Listing 11.04B.  Listing 11.04B describes disorganization of

motor function as follows: "Significant and persistent disorganization of motor function in two

extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and

station (see 11.00C)."  Listing 11.00C provides as follows:

> C.  *Persistent disorganization of motor function* in the form of paresis or
> paralysis, tremor or other involuntary movements, ataxia, and sensory
> disturbances (any or all of which may be due to cerebral, cerebellar, brain
> stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in
> various combinations, frequently provides the sole or partial basis for decision
> in cases of neurological impairment.  The assessment of impairment depends
> on the degree of interference with locomotion and/or interference with the use
> of fingers, hands and arms.

20 C.F.R.  Pt. 404, Subpt. 404, App.1, 11.00C.

In the decision, the ALJ determined Peterson "does not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed

impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and

404.1526)."  (Tr. 20.)  The ALJ's step three analysis is as follows:

35

The severity of the claimant's impairments does not meet or medically equal the level of severity of an impairment described in Listing 1.04 (disorders of the spine), Listing 11.08 (spinal cord or nerve root lesion), or any other listing in Appendix 1, Subpart P of the Regulations.  The evidence of record does not demonstrate disorganization of motor function as described in Listing 11.04B, i.e., significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross dexterous movements, or gait and station.

As support for the contention that the claimant's impairment satisfies Listing 11.08, the claimant submitted evidence of the opinion of treating physician, K.C. Ravishankar, M.D. (Exhibit 21F).  On May 5, 2014, Dr. Ravishankar indicated that there is evidence that the claimant has a spinal cord lesion because a syrinx of the spinal cord qualifies as a lesion or an abnormality of the spinal cord (Exhibit 21F/2).  Further, he opines the claimant exhibits spasticity in her two [lower] extremities (Exhibit 21F).  However, he failed to check the box which asks if the syrinx resulted in "sustained disturbance of gait and station," which is required under 11.04B.  The undersigned gives limited weight to Dr. Ravishankar's opinion because it is at odds with another opinion he issued on the same date, indicating there is no evidence of compromise of the claimant's nerve root or the spinal cord, and no <u>motor loss</u> or neuro-anatomic distribution of pain (Exhibit 20F).

Moreover, Dr. Ravishankar also failed to check the box that asks does the claimant exhibit "significant and persistent disorganization of motor function in two extremities"?  (Exhibit 21F/2).  To his credit, he then checked the yes box that asked, "If yes, is it in two legs"?  However, "significant and persistent disorganization of motor function in two extremities" must result, under Listing 11.04B, in "<u>sustained</u> disturbance of gross and dexterous movements or gait and station," and Dr. Ravishankar failed to indicate whether it did.  To the contrary, on April 15, 2013, Dr. Ravishankar's treatment notes indicate the claimant had chronic spasticity in the lower limbs, but no focal weakness, decrease of strength, or <u>abnormal limb movements</u> (Exhibit 13F/7).  Thus, even considering this Dr. Ravishankar's opinion, the undersigned finds the claimant does not meet the criteria of Listing 11.08 with reference to Listing 11.04B.

(Tr. 20-21) (emphasis in original).

As set forth above, the Court has already recommended remand on the grounds the ALJ

failed to articulate "good reasons" for rejecting Dr. Ravishankar's May 2014 opinions.  The

Court, therefore, will not address the merits of Peterson's second assignment of error because the

ALJ's step three finding was also based on his interpretation of Dr. Ravishankar's opinions, which may change on remand.  The Court encourages the ALJ to consider enlisting the assistance of a Medical Expert to help evaluate whether Peterson meets or equals the requirements of Listing 11.08.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this Report & Recommendation.

 *s/ Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: January 25, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).   Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**